Filed 8/6/19

## CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F076034 |
| Plaintiff and Respondent, | (Super. Ct. No. 15CR05059) |
| v. | |
| DIONICIO GUTIERREZ-SALAZAR, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Merced County. Ronald W. Hansen, Judge.

Hilda Scheib, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Jennifer M. Poe, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part B of the Factual and Procedural Background and parts I–III of the Discussion.

**INTRODUCTION**

Defendant Dionicio Gutierrez-Salazar was charged, tried, and convicted by a jury of two murders for homicides committed in 2013 and 2015. As to the 2013 homicide, defendant was convicted of first degree murder on a felony-murder theory. Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), which became effective on January 1, 2019, amended the felony-murder rule in California. We asked the parties to brief what effect, if any, this amendment has on defendant's murder conviction relating to the 2013 homicide. In the meantime, several cases have held a defendant seeking relief under Senate Bill 1437 must do so by filing a petition in the court where the defendant was sentenced. (See *People v. Martinez* (2019) 31 Cal.App.5th 719, 727–729; accord, *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1148–1153; *In re Taylor* (2019) 34 Cal.App.5th 543; see *People v. Carter* (2019) 34 Cal.App.5th 831–835.) In our appellate review of the record to consider this new law and its potential retroactive application to this case, we have discovered defendant is not entitled to relief under Senate Bill 1437. We therefore consider and deny relief on this appeal in the published part of this opinion. In doing so, we bypass the question of whether defendant must first comply with the petition procedure to apply for relief as unnecessary to our analysis under the circumstances of this case.

**FACTUAL AND PROCEDURAL BACKGROUND**

The trial court consolidated into one trial two murder charges alleged against defendant that were committed on different dates, one from 2013 (count 2), and one from 2015 (count 1). A jury convicted defendant of both counts of first degree murder (Pen. Code, § 187, subd. (a); undesignated statutory references are to the Pen. Code). As to count 1, the jury found true a multiple-murder special circumstance allegation (§ 190.2, subd. (a)(3)), and a personal use of a deadly weapon enhancement allegation (§ 12022, subd. (b)(1)). As to count 2, the jury also found true a multiple-murder special

2.

circumstance allegation (§ 190.2, subd. (a)(3)), and a felony-murder allegation (§ 190, subd. (a)(17)) that the murder was committed during the commission of a robbery. Defendant challenges his convictions, arguing the trial court prejudicially erred by admitting evidence of his statements during both murders related to his involvement in a Mexican drug cartel; the trial court prejudicially erred by granting the prosecution's motion to consolidate the trial on the two murder counts; even if the trial court did not err in consolidating the trial, the consolidation resulted in "gross unfairness" to defendant, denying him his Fourteenth Amendment right to due process; and the cumulative effect of these errors resulted in a violation of his right to due process. In supplemental briefing, the parties also address the effect of Senate Bill 1437 on defendant's conviction on count 2.

### A.     February 2013 Murder (Count 2)

In February 2013, Teresa Jimenez was visiting her son in California. Ramon Jimenez, Teresa's husband from whom she was separated, lived nearby. Teresa testified she went to Ramon's house and he left to go to Delhi but said he would return shortly. About five minutes later, Teresa was eating in the kitchen when Ramon entered with three men. Teresa heard the men ask for money related to a loan. One of the men entered the kitchen with Ramon, and Ramon handed him a beer. Ramon took two more beers to the men in the living room. Ramon then went into the bedroom. According to Teresa, one of the men entered the kitchen and told Teresa to come with him. She followed him to the bedroom and he told her to sit on the bed. Teresa sat near Ramon who was also sitting on the bed. The man pulled out a gun and pointed it at Teresa and said they "didn't know who they were, like something or other from Michoacan." While pointing the gun at Teresa, he told Ramon: "'Give it to me or I will kill your wife.'" Ramon told him "he had nothing." The man told Teresa to turn around; Teresa complied and put her head down. Teresa testified the man then shot Ramon, and Ramon fell on top

3.

of Teresa. Teresa never saw anyone come into the bedroom besides the man who shot Ramon. She testified the men started grabbing things and Teresa saw them take a briefcase. Once they left, Teresa ran to tell her daughter-in-law Ramon had been killed. They called the police. Teresa did not remember what the men looked like but she recalled the shooter was "the youngest of them all and the whitest of them all."

Police preserved the beer cans found at the scene and tested them for DNA. The DNA results led to the identification of Rogacino Munoz as a suspect. Munoz agreed to testify as part of his plea agreement. However, when the time came for him to testify, Munoz became reluctant. But he eventually agreed again to take the stand and testified he was afraid.

According to Munoz, he met defendant in 2012 when Munoz arrived from Mexico. A few months later, defendant asked Munoz to accompany him to pick up a payment and some receipts. In exchange, defendant was to get paid $3,000, and he told Munoz and Luis Perez they would each receive $1,000. They went to Ramon's house and saw Ramon in his van. Defendant went to talk to Ramon, followed him into the house, and told Munoz and Perez to come inside. They were all in the living room when defendant asked Ramon, "'Are you going to give them to us in a good way?'" Ramon responded, "'Or are you going to take them from me in a bad way?'" Ramon then went to retrieve beers and defendant grabbed the gun he had in his back pocket. Defendant said, "'I'm going to kill them.'" Munoz recalled there was a lady in the kitchen eating. Defendant and Ramon walked into the bedroom and defendant came out again saying, "'I'm going to kill them.'" Defendant told the woman in the kitchen to follow him to the bedroom.

Munoz followed defendant and the woman to the room where he saw Ramon sitting on the bed. The woman sat next to Ramon. Defendant again asked Ramon for the payments, and Ramon responded he could not find them. Defendant pointed the gun at the woman and told Ramon if he did not give him the receipts and money, he would kill

4.

her.  He also said, "'[W]e're from the Familia Michoacana.'"  Munoz testified he pushed defendant's gun down, said "No," and then told Ramon and the lady to turn around.  According to Munoz, the lady turned first and, as Ramon started to turn, Ramon "tripped, like he was going to fall" and Munoz stopped him from falling.  Defendant then shot Ramon in the head.  Munoz walked out, turned back, and saw defendant, who looked calm.  Munoz told Perez "[l]et's go" because defendant had killed the man; they went to the car.  Munoz testified, when he and Perez were in the car, he realized the woman was still inside and he did not want defendant to kill her, so he went back inside.  Defendant was on the phone when Munoz entered, and Munoz told him they should leave because the police would be coming.  Munoz went back outside and defendant stayed in the room.  Munoz again went back in and saw defendant rummaging through a dresser drawer and he noticed defendant had placed a briefcase outside of the room.  Munoz again told defendant they needed to leave, but defendant did not respond.  Munoz went back to the car and defendant eventually exited the house with a briefcase, a blanket, $1,000, and a beer.  According to Munoz, defendant "was singing when he came out."  Defendant gave Munoz and Perez each $320 and told them he would give them the other $1,000 when he received it.

Officer Jose Sanchez interviewed defendant on September 8, 2015, in connection with the investigation of a 2015 murder.  According to Sanchez, during that interview, defendant stated he was "present" during and "had also taken part in" Ramon's murder.  He reported accompanying two other men, Munoz and Perez, to Ramon's house to collect money Ramon owed Munoz.  Defendant identified photographs of Munoz and Perez as the two men.  When they arrived at Ramon's house, Ramon was in his van about to leave.  They approached Ramon and he invited them inside.  According to defendant, while inside the house, Perez and Munoz went to the bedroom with Ramon.  Ramon's wife was in the kitchen and was also ordered to go to the bedroom.  Defendant stated he heard a single gunshot, then "Perez ran out of the bedroom holding a revolver in his hand,

5.

and they fled the scene." They did not get any money but they took a black briefcase that contained documents. Police did not recover defendant's DNA from Ramon's house.

### B.  September 2015 Murder (Count 1)[*]

In September 2015, defendant shared a home with Alexis Jimenez and Francisco Alvarez. In early September, Carlos Herrera also came to stay with them for a period of time. Herrera would frequently talk to himself nonsensically and ingest methamphetamine. According to Alvarez, Herrera would "get violent" and be disrespectful when he used methamphetamine. Herrera carried a small pocketknife in his pocket.

Alvarez testified, around September 5th or 6th, Herrera ingested methamphetamine and referred to defendant's daughter as a whore. Herrera was bigger and heavier than defendant. Jimenez testified Herrera asked Alvarez if he wanted to die. Later that day, Herrera told Jimenez and defendant he could kill them both, and then he tried to tackle defendant. Herrera and defendant began punching each other until defendant managed to subdue Herrera and then released him. According to Jimenez, defendant walked away and told Herrera to stop because he did not want to fight, but Herrera again started punching defendant in his chest and face. Defendant and Herrera wrestled on the ground in the kitchen and then moved to the living room. Jimenez and Alvarez testified they saw Herrera pull out a knife at some point and try to stab defendant. Defendant swatted the knife out of Herrera's hand. Defendant hit Herrera with a beer can and then in the head with a toy car, knocking him to the floor. At that point, Herrera stopped fighting because he was "knocked out." Defendant grabbed a knife from the kitchen counter and stabbed Herrera in the chest. Jimenez heard Herrera making groaning noises as defendant stabbed him; eventually, the noises stopped. Defendant asked Alvarez to take a video on defendant's phone and then he asked Jimenez

_____

[*]See footnote, *ante*, page 1.

6.

to record him. At trial, the People introduced pictures of defendant stabbing Herrera. Jimenez and Alvarez rode with defendant to an almond orchard where they burned Herrera's body. The People also introduced a picture of Herrera's burned body.

The police received information a homicide may have occurred at a residence located in Atwater, California. They conducted a search of the home that revealed blood stains on the carpet and a car in front of the house with scratches on its sides, tree debris, and unhulled almonds on top of it, and tree debris and leaves throughout the interior. Some of the carpet stains in the house appeared to have been scrubbed. Alvarez eventually directed the police to the almond orchard where they discovered Herrera's deceased and burned body. Forensic pathologist Dr. Mark Super testified he conducted an autopsy on Herrera's body and identified 43 knife-type wounds.

Officer Sanchez interviewed defendant on September 8, 2015, in connection with the investigation into Herrera's death. Defendant reported that on September 6, 2015, he overheard Herrera call one of defendant's stepdaughters a whore and they got into an argument. When asked about the bloodstains in his home, defendant stated he hit Herrera in the head with a beer can, causing him to bleed. He reported the fight ended at that point; Herrera walked away from the house and he had not been seen since. When confronted with evidence his roommates had already spoken to police and the body had been found, defendant stated Herrera had reached into his pocket to try to obtain a pocketknife during the fight. Defendant hit Herrera with a toy truck to try to dislodge the knife from his hand. At that point, police told defendant his roommates reported taking pictures and possibly a video of the stabbing. Defendant then admitted he stabbed Herrera. When asked if he said anything during the stabbing, defendant reported saying "Caballeros Templarios." He reported feeling nothing, no remorse or regret. Defendant stated Herrera had threatened him but defendant was not afraid of him and did not feel threatened. The police obtained defendant's cellular phone and retrieved the pictures depicting him stabbing Herrera.

## DISCUSSION

### I.    Admission of Defendant's Statements Related to the Mexican Drug Cartel[*]

Defendant first challenges the trial court's admission of statements he made during the murders that related to his involvement in a Mexican drug cartel.

#### A.    Relevant Factual Background

Before trial, the prosecutor moved to admit and the defendant moved to exclude evidence of defendant's membership or participation in a Mexican drug cartel known as Los Caballeros Templarios. After balancing the probative value of such evidence against its potential for prejudice, the court held admissible defendant's statements regarding his membership in the cartel and Teresa Jimenez's testimony regarding the gunman mentioning Los Michoacanos during the 2013 robbery/murder, but it excluded any other evidence of the cartel's activities. The court concluded such evidence was relevant to the issue of intent to kill and willingness to kill, and it noted that "neither side's going to develop evidence about who are Michocanos [*sic*] and what type of organization they are or who are the Cavarellos [*sic*] Templarios." It noted "the key factor is that the statements were made by the Defendant."

The court revisited the issue again during Munoz's testimony, and it reiterated its ruling that defendant's statements regarding being a leader of the Mexican cartel Caballeros Templarios, formerly known as Los Michoacanos, were admissible. However, Munoz could not mention that the cartel tortured or decapitated people. Munoz then testified he heard defendant say "Los Michoacanos" when they were in Ramon Jimenez's bedroom. Munoz also testified defendant told him Los Michoacanos is a Mexican cartel and defendant was a leader in the cartel.

---

[*]See footnote, *ante*, page 1.

**B.    Standard of Review and Applicable Law**

Evidence is admissible only if it is relevant.  (Evid. Code, § 350.)  All relevant evidence is admissible except as otherwise provided by a statutory or constitutional exclusionary rule.  (See Cal. Const., art. I, § 28, subd. (f)(2); Evid. Code, § 351.)  Relevant evidence is defined as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)  The general test of relevance "'is whether the evidence tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.'"  (*People v. Bivert* (2011) 52 Cal.4th 96, 116.)

A court may exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  "Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time."  (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)  "Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.  [Citations.]' [Citation.]"  (*Id*. at pp. 1124–1125; see *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369–1370.)  "[S]tate law error in admitting evidence is subject to the traditional *Watson* [*People v. Watson* (1956) 46 Cal.2d 818] test:  The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error."  (*People v. Partida* (2005) 37 Cal.4th 428, 439.)  Due process is offended only if admission of the irrelevant evidence renders the trial fundamentally unfair.  (*Ibid.*)

In cases not involving a gang enhancement, "evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal. [Citation.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)  "But evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation … can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*Ibid.*)

### C.     Analysis

Defendant contends admission of evidence of his connection to and leadership in a Mexican drug cartel and the prosecutor's related argument in closing used "to link the two cases" was so prejudicial that it rendered his trial fundamentally unfair in violation of his right to due process.  He argues "[t]he only purpose that the evidence served in this case was to allow the prosecution to limn [defendant] as a ruthless member of a Mexican gang, which is … generally perceived as dangerous, violent, sadistic and brutal."  He contends his convictions should be reversed on this basis.  The People respond such evidence was relevant because it "tended to logically, naturally, and by reasonable inference establish both [defendant's] motive and identity."  Additionally, they contend the probative value was not outweighed by the danger of undue prejudice, confusion, or time consumption because the testimony was limited and "extremely brief," Munoz noted defendant was no longer a member of the cartel, and "[t]here was no evidence that [defendant] committed other crimes, engaged in illegal activity, or participated in any violent or ruthless behavior."  Finally, they contend even if the trial court erred in admitting such testimony, any error was harmless in light of "the overwhelming evidence of [defendant's] guilt and the modest role the evidence played in determining [defendant's] identity, motive and lack of provocation."  We conclude the trial court did

10.

not prejudicially err in admitting such evidence and its admission did not violate defendant's right to due process.

This case is readily distinguishable from *People v. Albarran* (2007) 149 Cal.App.4th 214, which defendant cites in support of his argument. Albarran was charged with attempted murder, shooting at an inhabited dwelling, and three counts of attempted carjacking and attempted kidnapping; a gang enhancement (§ 186.22) was alleged as to all counts. (*People v. Albarran*, *supra*, at p. 219.) Before trial, the court found evidence of the defendant's membership in the 13 Kings gang relevant to the issues of motive and intent and determined it was more probative than prejudicial. (*Id.* at pp. 219–220.) During trial, the prosecutor made multiple references during argument to the defendant being a member of a "dangerous" street gang and showed a picture of Albarran's tattoos. (*Id.* at p. 220.) Two deputies testified "at length" regarding identities of other 13 Kings members, the wide variety of crimes they had committed, and the defendant's gang involvement. (*Albarran*, at pp. 220–221, 227–228.) A deputy opined the shooting at issue was gang related, though there was no direct evidence to link the 13 Kings to the crimes. (*Id.* at pp. 220–221, 227.) After trial, Albarran moved for a new trial, asserting insufficient evidence supported the gang allegations and, absent the gang allegations, the gang evidence was irrelevant and prejudicial, warranting a new trial on all charges. (*Albarran*, at p. 222.) The trial court granted Albarran's motion on his argument that insufficient evidence supported the gang allegations but denied it as to the underlying charges, finding the gang evidence was relevant to issues of intent and would not have affected the verdict one way or another. (*Id*. at pp. 225–226.)

The appellate court held the court erred in failing to grant Albarran a new trial on all charges, noting "[e]vidence of Albarran's gang involvement, standing alone, was sufficient proof of gang motive." (*People v. Albarran*, *supra*, 149 Cal.App.4th at p. 228.) But "[e]vidence of threats to kill police officers, descriptions of the criminal activities of other gang members, and reference to the Mexican Mafia had little or no bearing on any

11.

other material issue relating to Albarran's guilt on the charged crimes and approached being classified as overkill." (*Ibid*.) It concluded the gang evidence "was so extraordinarily prejudicial and of such little relevance that it raised the distinct potential to sway the jury to convict regardless of Albarran's actual guilt" such that it rendered defendant's trial "fundamentally unfair." (*Id.* at pp. 228, 232.) It held "[g]iven the nature and amount of this gang evidence at issue, the number of witnesses who testified to Albarran's gang affiliations and the role the gang evidence played in the prosecutor's argument, we are not convinced beyond a reasonable doubt that the error did not contribute to the verdict." (*Id*. at p. 232.)

Unlike in *People v. Albarran*, here the trial court only permitted brief and limited testimony regarding defendant's cartel involvement, namely, defendant's own statements regarding his cartel affiliation and those made at the scene of the crimes that were relevant to defendant's motive and identity, and thus, to elements of the crimes charged. (See *People v. Hernandez*, *supra*, 33 Cal.4th at p. 1049.) The trial court acknowledged the potential for prejudice related to the introduction of gang-like evidence, excluded evidence of the cartel's activities, and prohibited the parties from offering additional evidence about Los Michoacanos and Caballeros Templarios. Additionally, evidence of defendant's cartel membership was also relevant to Munoz's credibility and his testimony regarding his fear of testifying. On this record, we cannot conclude the trial court abused its broad discretion in admitting such evidence. (See *People v. Hernandez*, *supra*, at pp. 1050–1051 [evidence of gang membership was relevant to charged offense where "defendant … himself injected his gang status into the crime. He identified himself as a gang member and attempted to use that status in demanding money from the victim"]; see also *People v. Williams* (1997) 16 Cal.4th 153, 193 [gang evidence relevant to prove identity and motive]; *People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449–1450 [limited gang evidence is admissible for a legitimate purpose: to show basis for witness's fear of testifying].)

Defendant contends the admission of evidence related to his cartel membership violated his federal due process rights. The issue in determining whether the error violated federal due process is not whether the admission of the evidence violated state law evidentiary principles, but whether the trial court committed an error which rendered the trial arbitrary and fundamentally unfair. (See *People v. Partida*, *supra*, 37 Cal.4th at p. 439.) Using this test and based on our conclusion the limited admitted evidence was relevant to the charged offenses, we cannot conclude the instant case is "one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair." (*People v. Albarran*, *supra*, 149 Cal.App.4th at p. 232.)

Moreover, even if the trial court erred in admitting such evidence, we conclude the admission of such evidence was harmless. Without considering evidence of defendant's statements regarding his cartel involvement, there was strong evidence inculpating defendant as to both murders. There were photographs of him stabbing Herrera and he admitted committing the murder, though he alleged it was in self-defense. He also admitted he was present when Ramon Jimenez was murdered and was implicated as the perpetrator by Munoz, whose testimony was corroborated in part by Teresa Jimenez's testimony and defendant's admission that he was present on the day of the murder. Additionally, there were multiple theories under which defendant could have been convicted of Ramon's murder. Given the strength of such evidence, we cannot conclude under the standard of review of either *Watson* or *Chapman v. California* (1967) 386 U.S. 18 that the brief testimony regarding defendant's cartel association, with no further discussion, prejudiced defendant. (See *People v. Watson*, *supra*, 46 Cal.2d at p. 836 [reversal required only if reasonably probable a result more favorable to appealing party would have been reached in absence of error]; *People v. Marks* (2003) 31 Cal.4th 197, 226–227 ["we have held the application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution, and thus we review allegations of

13.

error under the 'reasonable probability' standard of *Watson*"]; see also *Chapman v. California*, *supra*, at p. 24 [federal constitutional error requires proof of harmlessness beyond a reasonable doubt].)

We reject defendant's first contention.

## II.     Consolidation of Murder Charges[*]

In his next two contentions, defendant challenges the consolidation of the murder charges into one trial.  He first argues reversal is required because the trial court prejudicially erred in granting the prosecutor's motion to consolidate, denying him a fair trial.  He also contends, even if the trial court did not err in granting consolidation, the consolidation resulted in "gross injustice."

### A.     Relevant Factual Background

Before trial, the People moved to consolidate the trials on the two murder charges alleged against defendant (case Nos. 15CR-04742A & 15CR-05059).  Defendant opposed the motion, noting that though the two murder charges could be joined under section 954 absent a clear showing of prejudice, here the factors weighed against joinder.  Defendant argued the cases had no common aspects, the facts and evidence of the murders were unduly inflammatory, the evidence of the 2015 murder was stronger than the evidence of the 2013 home invasion murder, and joinder permitted the People to seek a multiple-murder special circumstance.  Defense counsel further argued with regard to the 2015 murder, "it would be so difficult for a jury to be persuaded … of a [*Flannel*] type of defense and a manslaughter heat of passion killing if the jury were to hear that there was a basically ruthless, cold-blooded, home invasion killing where the persons, the man and his wife, are taken into the bedroom and then the man is just shot dead cold in the head ….  I just wouldn't stand a chance on the other case of persuading the jury that it was a … heat of passion offense."

---

[*]See footnote, *ante*, page 1.

14.

The court responded it had "faith in our jurors they're able to separate things out." It noted "each [murder] has its own inflammatory aspects. So joining them together kind of inflates the inflammatory issues, but there would be cross-admissibility as to the issue of intent to kill. Even subject to a 352 analysis, I think they can come in." With regard to whether the evidence of either case was unduly inflammatory, the court concluded "they are so different … the jury would be able to separate them, because the victim in the 2015 case is not entirely blameless for this situation, while the home invasion case the victim was unarmed. It's a different situation." The court held defendant had not met his burden in establishing that consolidation would result in a clear showing of prejudice. Accordingly, it granted the People's motion to consolidate.

## B. Standard of Review and Applicable Law

Section 954 discusses the consolidation of accusatory pleadings. It provides in part:

> "An accusatory pleading may charge … two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated. The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged, and each offense of which the defendant is convicted must be stated in the verdict or the finding of the court; provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately. An acquittal of one or more counts shall not be deemed an acquittal of any other count." (§ 954.)

The law favors the joinder of counts because it promotes efficiency. (*People v. Merriman* (2014) 60 Cal.4th 1, 37.) Nonetheless, a trial court has discretion to order that properly joined charges be tried separately. (*Ibid.*) And, although a trial court is authorized to consolidate two or more accusatory pleadings for trial in an appropriate case, it is not required to do so. (*Ibid.*; see § 954.) "In exercising its discretion in this

15.

regard, the court weighs 'the potential prejudice of joinder against the state's strong interest in the efficiency of a joint trial. [Citation.]' [Citation.]" (*Merriman*, at p. 37.)

Appellate review of a trial court's joinder order proceeds in two steps. (*People v. Simon* (2016) 1 Cal.5th 98, 122.) First, we examine whether, in light of the information available at the time, the trial court abused its discretion in ordering consolidation or denying the severance motion prior to the guilt phase. (*Ibid.*; see *People v. Merriman*, *supra*, 60 Cal.4th at p. 37.) Where the statutory requirements for joinder are met, a defendant must make a "'clear showing of prejudice'" to establish that the trial court abused its discretion. (*People v. Simon*, *supra*, at pp. 122–123; see *People v. Merriman*, *supra*, at p. 37.) In evaluating whether the trial court abused its discretion, we consider: "(1) whether the evidence relating to the various charges would be cross-admissible in separate trials, (2) whether any of the charges are unusually likely to inflame the jury against the defendant, (3) whether a weak case has been joined with a strong case or with another weak case, and (4) whether one of the charges is a capital offense or the joinder of the charges converts the matter into a capital case." (*People v. Simon*, at p. 123.)

Second, even if the trial court's ruling was proper as a matter of state law, we will reverse the judgment if the defendant shows that joinder of the charges actually resulted in "gross unfairness" amounting to a denial of due process during the guilt phase. (*People v. Simon*, *supra*, 1 Cal.5th at p. 123; see *People v. Avila* (2006) 38 Cal.4th 491, 575.)

### C. Analysis

As a threshold matter, defendant concedes the two murder charges met the statutory requirements for joinder because they are "two or more different offenses of the same class of crimes or offenses." (§ 954.) Thus, our inquiry next turns to whether defendant made a clear showing of prejudice such that the trial court abused its discretion in granting the motion to consolidate.

### 1. *Cross-admissibility of evidence*

First, though the trial court suggested evidence of the two murders could be cross-admissible on intent to kill, the People concede that at the time of the motion to consolidate, there was little evidence demonstrating that evidence of the crimes would be cross-admissible. Irrespective, although cross-admissibility of evidence may be an independently sufficient condition justifying a trial court's denial of severance, it is not a necessary one. (See *People v. Simon*, *supra*, 1 Cal.5th at p. 123; *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1221–1222.) "In the absence of cross-admissibility, we turn to the remaining factors to assess whether the trial court abused its discretion." (*People v. Simon*, at pp. 123–124.)

### 2. *Particularly inflammatory charges*

Defendant argues "evidence relating to the 2015 murder was particularly likely to inflame the jury against [defendant] and to affect its conclusion as to [defendant]'s guilt in the 2013 case." Comparing the evidence offered in support of each murder, it is true the photographs of defendant stabbing Herrera and depicting Herrera's dead, burned body were more likely to inflame the jury's passions. "But the animating concern underlying this factor is not merely whether evidence from one offense is repulsive, because repulsion alone does not necessarily engender undue prejudice. [Citation.] Rather, the issue is 'whether "'strong evidence of a lesser but inflammatory crime might be used to bolster a weak prosecution case' on another crime."' [Citation.]" (*People v. Simon*, *supra*, 1 Cal.5th at p. 124.) "Only when a defendant has made a clear showing of potential prejudice may we find an abuse of discretion in this context." (*Id.* at p. 127.)

Here, any effect the photographs of the 2015 murder would have had on the jury as a result of joinder was not unduly prejudicial given that the 2013 murder was no more serious an offense and was also supported by strong evidence. (See *People v. Simon*, *supra*, 1 Cal.5th at p. 125.) The 2013 murder occurred during a robbery and the victim was murdered in his own home, next to his wife, upon whom his dead body collapsed.

17.

Defendant admitted he was present on the date of the offense (though he denied being the shooter), and Munoz testified defendant shot Ramon Jimenez in the head after Ramon failed to provide the receipts and payments requested. He noted defendant was singing when he left the scene. There were multiple theories under which the jury could have concluded defendant was guilty of first degree felony murder. In contrast, defendant admitted he committed the 2015 murder but argued he was provoked or acted in self-defense; however, the photographic evidence depicted defendant repeatedly stabbing Herrera, and Alexis Jimenez and Francisco Alvarez's testimony both supported the jury's conclusion the murder was deliberate and premeditated.

On this record, we cannot conclude defendant has shown the potentially inflammatory evidence from the 2015 murder would have altered the outcome of the 2013 murder charge, or vice versa. (See *People v. Simon*, *supra*, 1 Cal.5th at pp. 124–125 [concluding though facts of gang-related murder were unlikely to evoke same emotions as murder of two teenagers shot multiple times where one was kidnapped and raped before being shot, any effect of joinder on jury "was not unduly prejudicial" given that neither murder was more serious an offense and both were supported by strong evidence]; *People v. McKinnon* (2011) 52 Cal.4th 610, 631 ["Neither murder was especially likely, or more likely than the other, to inflame the jury's passions. Each killing was cruel and brutal and committed for seemingly trivial reasons"].)

### 3. *Relative strength of cases*

Defendant next argues "the prosecution's case in [Ramon's] murder was weak, not because there is any doubt that [Ramon] was killed but because there is serious doubt that [defendant] was the killer." He contends the evidence "was far weaker than in the 2015 shooting, which [defendant] admitted—albeit not the facts of its genesis." He asserts though "Munoz … identified [defendant] as the instigator and perpetrator of the murder," "Munoz personally gained tremendously by so testifying—he exonerated himself from

the murder and secured a far less severe voluntary manslaughter conviction with a sentence of 14 years, as opposed to a life term on the murder charge."

"The core prejudice concern arising in connection with this [factor] is that jurors may aggregate evidence and convict on weak charges that might not merit conviction in separate trials." (*People v. Simon*, *supra*, 1 Cal.5th at p. 127.) "But even where evidence from one incident could be considered 'inflammatory' as the term is understood in our case law [citation], we will find no abuse of discretion if the evidence of guilt for each of the joined incidents is sufficiently compelling." (*Ibid*.)

It is true "[a] conviction can not [*sic*] be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (§ 1111.) But here, there was independent evidence corroborating Munoz's testimony and otherwise linking defendant to the commission of the 2013 murder. Defendant, by his own admission, placed himself at the scene of the crime. Additionally, Teresa Jimenez testified to the series of events preceding the murder, which largely corroborated Munoz's testimony regarding the number of men present at the house, the discussion regarding a loan, the order in which the events in the house unfolded, and her face down position when Ramon was shot. Such evidence coupled with defendant's concession and Munoz's testimony identifying defendant as the shooter was sufficient to support defendant's conviction for the 2013 murder. Notably, under the felony-murder theory, the jury could have also found defendant guilty of the 2013 murder without concluding he was the shooter, so long as it made the other requisite findings.

Given the other evidence supporting defendant's conviction for the 2013 murder and the various theories under which the jury could have convicted him, contrary to defendant's argument, we cannot conclude evidence of the 2013 murder was "far weaker" than that of the 2015 murder such that evidence of the latter "bolstered" the

19.

likelihood of defendant's conviction of the former. Rather, because neither was a weak case that needed joinder to bolster the likelihood of conviction, defendant also fails to make a clear showing of potential prejudice under this factor.

### 4. Conversion of charges resulting from joinder

In cases of joinder where one of the charged crimes is a capital offense, the Supreme Court has held the consolidation or severance issue must be analyzed with a higher degree of scrutiny and care than is normally applied in a noncapital case. (See *People v. Simon*, *supra*, 1 Cal.5th at p. 128; *Williams v. Superior Court* (1984) 36 Cal.3d 442, 454.) The Supreme Court has since qualified *Williams*, explaining that the subsequent enactment of section 790, subdivision (b), which specifically provides for joinder of capital cases, makes it clear "'such a heightened analysis is no longer called for.'" (*People v. Jones* (2013) 57 Cal.4th 899, 927; see *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1229, fn. 19.) Our Supreme Court has also said even greater scrutiny is required "when the joinder of separate murder charges gives rise to the special circumstance allegation of multiple murder." (*People v. Simon*, *supra*, at p. 128; see *Williams v. Superior Court*, *supra*, at p. 454.)

Here, though the joinder of the counts permitted the prosecutor to add multiple-murder special circumstances, it did not convert the matter into a capital case. Additionally, the separate offenses were supported by strong evidence, and the court weighed the potential prejudice resulting from joinder before consolidating the cases. We cannot conclude the trial court abused its discretion on this basis. (See *People v. McKinnon*, *supra*, 52 Cal.4th at p. 632; *People v. Simon*, *supra*, 1 Cal.5th at p. 128.)

### 5. Consolidation did not result in gross unfairness

Finally, defendant does not establish joinder resulted in a denial of fundamental fairness. "'"A pretrial ruling that was correct when made can be reversed on appeal only if joinder was so grossly unfair as to deny due process."'" [Citation.]" (*People v.*

20.

*McKinnon*, *supra*, 52 Cal.4th at p. 632.) "Gross unfairness" exists when there is a reasonable probability that joinder affected the jury's verdict. (*People v. Merriman*, *supra*, 60 Cal.4th at p. 49.)

Pointing to the prosecutor's references during closing argument and rebuttal to the photographs of defendant stabbing Herrera, defendant argues "the highly inflammatory photographs from the 2015 stabbing were used by the prosecution in trying the case to bolster the relative weakness of the 2013 case." But, as we have already concluded, there was strong evidence supporting both cases.

Additionally, during argument regarding the 2013 murder, the prosecutor focused on the evidence in support of that offense as opposed to relying on evidence of the 2015 murder to bolster her case. Specifically, when discussing the 2013 murder, the prosecutor noted the 2015 killing of Herrera was a "brutal murder" with "gruesome photographs." She argued, though the evidence the jury heard regarding "the 2013 murder is a different type of evidence doesn't mean that it's any less compelling or that the murder of Ramon Jimenez matters any less." She asserted the evidence establishing defendant committed the robbery and the 2013 murder was "overwhelming."

The record also shows the jury was instructed on the elements of each of the charged crimes, told that "[e]ach of the counts charged in this case is a separate crime," and directed to "consider each count separately and return a separate verdict for each one." (CALCRIM No. 3515.) Absent some showing to the contrary, we presume the jury followed the court's instructions. (*People v. Merriman*, *supra*, 60 Cal.4th at pp. 48–49.) No such showing was made here.

Given the evidence in support of both convictions, including defendant's own admissions, the testimony of witnesses (including but not limited to that of the coparticipants), and the photographs, we cannot conclude it is reasonably probable the joinder affected the jury's verdict. Thus, joinder of the murder charges did not render the joint trial fundamentally unfair. (See *People v. Merriman*, *supra*, 60 Cal.4th at p. 49.)

21.

We reject defendant's second and third contentions.

### III.    Cumulative Error*

Defendant argues the errors committed were cumulatively prejudicial and deprived him of a fair trial.  We disagree.

> "Under the 'cumulative error' doctrine, we reverse the judgment if there is a 'reasonable possibility' that the jury would have reached a result more favorable to defendant absent a combination of errors.  (See *People v. Williams* (2009) 170 Cal.App.4th 587, 646; *In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32 ['Under the "cumulative error" doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial.'].)  'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial."'  (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)"  (*People v. Poletti* (2015) 240 Cal.App.4th 1191, 1216–1217.)

Here, there is no series of prejudicial errors to cumulate.  Accordingly, defendant cannot demonstrate the cumulative effect of the alleged errors resulted in prejudice.  (See *In re Reno* (2012) 55 Cal.4th 428, 483 ["As noted, claims previously rejected on their substantive merits—i.e., this court found no legal error—cannot logically be used to support a cumulative error claim because we have already found there was no error to cumulate."].)

We reject defendant's fourth contention.

### IV.    Senate Bill 1437

We requested supplemental briefing from the parties on the application and effect, if any, of Senate Bill 1437 on defendant's first degree murder conviction for Ramon Jimenez's 2013 murder.

####     A.    Applicable Law

On September 30, 2018, while defendant's appeal was pending, the Governor signed Senate Bill 1437, which became effective on January 1, 2019.  Senate Bill 1437

---

*See footnote, *ante*, page 1.

22.

"amend[s] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) It amends sections 188, which defines malice, and 189, which defines the degrees of murder to address felony-murder liability, and it adds section 1170.95, which provides a procedure by which those convicted of murder can seek retroactive relief if the changes in the law would affect their previously sustained convictions. (Stats. 2018, ch. 1015, §§ 2–4.)

Section 1170.95 permits those "convicted of felony murder or murder under a natural and probable consequences theory [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts …." (*Id.*, subd. (a).) An offender may file a petition under section 1170.95 where all three of the following conditions are met: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(1)–(3).) A trial court receiving a petition under section 1170.95 "shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section." (§ 1170.95, subd. (c).) If the petitioner has made such a showing, the trial court "shall issue an order to show cause." (*Ibid.*) The trial court must then hold a hearing "to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as

23.

if the petitioner had not been previously been [*sic*] sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1170.95, subd. (d)(1).)

"The parties may waive a resentencing hearing and stipulate that the petitioner is eligible to have his or her murder conviction vacated and for resentencing. If there was a prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony, the court shall vacate the petitioner's conviction and resentence the petitioner." (§ 1170.95, subd. (d)(2).) If a hearing is held, "[t]he prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (*Id.*, subd. (d)(3).) "[T]he burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (*Ibid.*) "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (*Ibid.*)

### B. Analysis

In his supplemental brief, defendant cites *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*) to argue he is entitled to the ameliorative benefits of Senate Bill 1437 on direct appeal and that we must reverse his conviction for first degree murder on count 2 based on this new legislation. The People respond that though "Senate Bill No. 1437 applies retroactively to the judgment in this case … the exclusive procedure for obtaining retroactive relief under Senate Bill No. 1437 is by filing a petition in superior court." They contend defendant "is not entitled to relief on direct appeal."

Our Supreme Court has held that when an "amendatory statute lessening punishment becomes effective prior to the date the judgment of conviction becomes final … it, and not the old statute in effect when the prohibited act was committed, applies," (*Estrada*, *supra*, 63 Cal.2d at p. 744; see *id.* at pp. 746–748), unless the enacting body

24.

"clearly signals its intent to make the amendment prospective, by the inclusion of either an express saving clause or its equivalent." (*People v. Nasalga* (1996) 12 Cal.4th 784, 793.) In other words, if the Legislature does not clearly signal its intent that a statutory amendment that mitigates punishment should only apply prospectively, a defendant whose judgment is not final when the amended law goes into effect should be entitled to benefit from the ameliorative change in the law. (See *Estrada*, *supra*, 63 Cal.2d at pp. 744–745.) This rule rests on an inference that when the Legislature has reduced the punishment for an offense, it has determined the "former penalty was too severe" and therefore "must have intended that the new statute imposing the new lighter penalty ... should apply to every case to which it constitutionally could apply." (*Id*. at p. 745.)

At least three recent Court of Appeal decisions have held that Senate Bill 1437 is not silent on the question of retroactivity; rather, through the enactment of section 1170.95, it expressly provides a mechanism for defendants to petition for relief in the sentencing court. (*People v. Martinez*, *supra*, 31 Cal.App.5th at pp. 727–729; accord, *People v. Anthony*, *supra*, 32 Cal.App.5th at p. 1153; see *People v. Carter*, *supra*, 34 Cal.App.5th at p. 835.) Accordingly, these courts held defendants cannot seek relief under Senate Bill 1437 on direct appeal but instead must file petitions in the court that sentenced them to obtain relief. (*People v. Martinez*, *supra*, at pp. 727–729; accord, *People v. Anthony*, *supra*, at pp. 1148–1153; see *People v. Carter*, *supra*, 34 Cal.App.5th at p. 835.)

We need not decide whether the same reasoning applies to preclude defendant from seeking relief on direct appeal in this case because, unlike in *Estrada*, the statutory changes resulting from Senate Bill 1437 do not benefit defendant such that it would lessen his punishment and entitle him to relief under the amended law. The jury was provided instructions allowing it to convict defendant of first degree murder as to the 2013 homicide pursuant to a felony-murder theory and the natural and probable consequences doctrine, as both were defined prior to the effective date of Senate Bill

25.

1437.  But the jury also found true a felony-murder special circumstance under section 190, subdivision (a)(17) with regard to the 2013 murder after being instructed:

> "In order to prove this special circumstance for a defendant who is not the actual killer but who is guilty of first degree murder as an aider and abettor or a member of a conspiracy, the People must prove either that the defendant intended to kill, or the People must prove all of the following:
>
> "1.  The defendant's participation in the crime began before or during the killing;
>
> "2.  The defendant was a major participant in the crime;
>
> "AND
>
> "3.  When the defendant participated in the crime, he acted with reckless indifference to human life."  (CALCRIM No. 703.)

The language of the special circumstance tracks the language of Senate Bill 1437 and the new felony-murder statutes.  (See *In re Taylor*, *supra*, 34 Cal.App.5th at p. 561.) Notably, defendant does not challenge the sufficiency of the evidence regarding the felony-murder special-circumstance finding.  And because the jury found true the special circumstance allegation, any potential post-Senate Bill 1437 instructional error related to the felony-murder rule and the natural and probable consequences doctrine would be harmless beyond a reasonable doubt because the jury made the requisite findings necessary to sustain a felony-murder conviction under the amended law.  Consequently, since defendant cannot benefit from a retroactive application of Senate Bill 1437, we need not resolve that issue, and instead we simply deny relief on this appeal.  (See *People v. Frazier* (2005) 128 Cal.App.4th 807, 826 ["Retroactive application of a defense is only required 'if its terms and the applicable facts permit, a defense to' defendant"]; see, e.g., *id*. at p. 827 [defendant not entitled to new trial to assess impact of defenses under Compassionate Use Act because defenses under the act did not apply to him]; *People v. Cawkwell* (2019) 34 Cal.App.5th 1048, 1053–1054 [remand not appropriate despite change in law governing pretrial mental health diversion because record established

26.

defendant was not eligible for diversion under amended law based on nature of his convictions]; see generally *People v. Coelho* (2001) 89 Cal.App.4th 861, 889 ["reviewing courts have consistently declined to remand cases where doing so would be an idle act that exalts form over substance because it is not reasonably probable the court would impose a different sentence"].) Nevertheless, nothing in this opinion should be construed as limiting defendant's right to file a petition in the trial court pursuant to section 1170.95. Any available relief, of course, may be constrained by the doctrine of the law of the case. (*People v. Stanley* (1995) 10 Cal.4th 764, 786.)

## DISPOSITION

The judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
POOCHIGIAN, Acting P.J.


_____
DeSANTOS, J.